ACCEPTED
14-14-00377-CV
FOURTEENTH COURT OF APPEAL
HOUSTON, TEXAS
4/8/2015 1:49:19 PM
CHRISTOPHER PRIN
CLERK

NO. 14-14-00377-CV

_____

IN THE COURT OF APPEALS
FOR THE FOURTEENTH DISTRICT OF TEXAS
HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
4/8/2015 1:49:19 PM
CHRISTOPHER A. PRINE
Clerk

_____

VICTOR ALARCON

*Appellant*

V.

ALCOLAC INC. and RHODIA INC.

*Appellees*

_____

Appealed from the 23rd District Court of Brazoria County, Texas
Trial Court Cause No.: 76868-CV

_____

**NOTICE OF APPELLEES' EXHIBITS FOR
ORAL ARGUMENTS ON APRIL 9, 2015**

_____

TO THE HONORABLE COURT OF APPEALS:

In compliance with the Court's letter of February 23, 2015, APPELLEES Alcolac Inc. and Rhodia Inc. give notice they will be presenting the following exhibits at oral arguments scheduled for April 9, 2015.

1.     Appellant's Brief, page 40.

2.     Appellant's Brief, page 41.

3.     Appellant's Brief, page 42.

1

4.     Appellant's Reply Brief, page 6.

Copies of these exhibits are attached hereto and pursuant to TRAP Appendix A, the appropriate

fees paid to the Court.

Respectfully submitted,

**WELSH LeBLANC, L.L.P.**

_/s/ H. Ronald Welsh_
H. Ronald Welsh
State Bar No. 21167600
rwelsh@welshleblanc.com
Daphne M. Cherry
State Bar No. 24006990
dcherry@welshleblanc.com
8 E. Greenway Plaza, Suite 1120
Houston, Texas  77046
Telephone: (713) 554-7770
Facsimile: (713) 554-7771
ATTORNEYS FOR APPELLEES,
**ALCOLAC INC. AND RHODIA INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was forwarded to all counsel of record via electronic service on this the 8th day of April 2015.

_/s/H. Ronald Welsh_
H. Ronald Welsh

listed by Iraq in the FFCD for TDG shipments. (Compare, CR V. 1 699 to 496 & 499).

In fact, evidence of Alcolac product identification is significantly better than evidence generally offered in product liability cases involving latent occupational disease. Typically, those cases rely on eyewitness testimony of personal observations, based upon individual memories that can span decades, with no ability to corroborate such testimony. *See, e.g. Balbos,* 604 A. 2d at 458 (witness identifies a product as "one of the products used"); *Roehline v. National Gypsum Co.,* 786 F. 2d 1225, 1226 (4th Cir. 1986) (testimony that "90 percent of the products used sufficient); *Reiter v. Pneumboabex,* 47 MD. 57, 62; 8 A. 3d 725, 728 (MD 2010). In this case, the unequivocal evidence offered by Appellant is unusually reliable compared to other toxic tort cases. There are actual written and photographic records of Alcolacs' product used to make mustard gas by Iraq. Accordingly, the Trial Court erred in finding insufficient evidence of product identification.

## A.    Alcolac Was the Only TDG Supplied to Iraq from 1987-1990.

The mustard gas to which Dr. Alarcon was exposed could only be manufactured from Alcolac TDG sent to Iraq. (CR V. 2, 1018). As reported by the CIA, Iraq had consumed approximately 1800 tons of mustard agent when the

conflict with Iran ended in 1988. (CR V. 1 1597). The Iraq Survey Group Report explains:

> The war with Iran ended in August 1988. According to Iraq, it consumed almost 19,500 chemical bombs, over 54,000 chemical artillery shells and 27,000 short-range chemical rockets between 1983 and 1988. Iraq declared it consumed about 1800 tons of mustard gas . . . Almost two-thirds of the CW weapons were used in the last 18 months of the war.

(CR V. 1, 1597). Additionally, Iraq declared that 100 tons of non-weaponized mustard was destroyed by Iraq by the end of 1988. (CR V. 1, 1013). During the Iran-Iraq war, Iraq was consuming chemical agents "as fast as it could be produced." (CR V. 1, 1596). UNSCOM concluded that Iraq consumed nearly 3000 tons of chemical weapons from 1981 to 1988. (CR V. 1, 1703). These reports indicate that Iraq had completely exhausted its mustard agent supplies by the end of the Iran-Iraq War.

Iraq ceased production of chemical weapons in 1988 after its war with Iran ended. (CR V. 1, 664, 1596). In 1990, chemical production activities for mustard resumed. (CR V. 1, 664, 1596, 1652). Consequently, any Iraq acquisitions of TDG in late 1987 – 1988 from Alcolac represented Iraq's only available TDG precursor for the production of the chemical weapon, mustard gas at that time.

While invoices indicate Alcolac supplied a minimum of four shipments of TDG to Iraq in 1987 and 1988, totaling 599 tons, circumstantial evidence strongly suggests there were additional shipments. (CR V. 1, 496-519, 699,799; V. 2,

41

120/5-21, 189, 202). The FFCD reveals that Alcolac, through Companies Inc. and Oriac Co., shipped 1000 tons of TDG to Iraq between 1987 and 1988. (CR V. 1, 699, 799). The FFCD declares that Alcolac was Iraq's only supplier of TDG from 1987 until the start of the Persian Gulf War in 1991. (CR V. 1, 673-4, 699, 799). Moreover, the U.S. Customs investigation revealed that Alcolac had actually destroyed documents and maintained very poor records. (CR V. 1, 45, 73; V. 2, 202). It is likely that Alcolac did not produce all of its sales invoices, either to the United States Customs Office or to the parties in this case.

Finally the FFCD reveals that 774 tons of mustard agent were produced between 1988-1990. (CR V. 1, 1016, Table I, 1652). Appellant's expert, Frank Parker, performed an assessment of this tonnage based upon the production formula revealed in the FFCD. For every ton of TDG, one ton of mustard was produced. (CR V. 2, 189). According to Mr. Parker, the FFCD production reports would lead a reasonable person to conclude that "it is more likely than not that all of the 774 tons of TDG produced from 1988 to 1990 were produced with Alcolac TDG." (CR V. 2, 189). Accordingly, the weapons which were armed and deployed in the Persian Gulf War contained mustard agent manufactured from Alcolac TDG.

A. **Iraq's Earlier Mustard Supplies Were Likely Exhausted by August 1988.**

The Appellees make misleading interpretations of the record. For example, Appellees claim that documents CR V. 1, 1013, 1596-97 & 1703, relating to Iraq's complete exhaustion of its mustard agent supply do not reach this conclusion and amount to "inference." (Appellees' Brief at 22). Appellees are wrong; these pages explain how quantities of mustard gas were handled after the Iran-Iraq war. As reflected by the following record cites:

- CR V. 1, 1013: shows that a total of 100 tons of mustard gas was destroyed by Iraq from 1985 to 1988, and that 30 tons were destroyed at the end of the Iraq-Iran war because "Iraq decided to get rid of the quantity after the end of the war."

- CR V. 1, 1597: shows that the CIA acknowledged Iraq's declaration that it consumed 1800 tons of mustard gas during the Iraq war, and deployed 81,000 artillery shells and chemical rockets containing chemical weapons.

Obviously, Iraq was not holding its TDG supply in reserve. Furthermore:

- CR V. 1, 1703 provides a supplemental CIA conclusion:

  "[O]nce the Iran-Iraq war was under way, Baghdad used lethal chemical weapons on a scale not seen in decades. Iraq began using . . blister agents in 1983. . . CW attacks against Iran increased until the conclusion of the Iran Iraq war in 1988. In addition Iraq used both CW and riot control agents against its own Kurdish populations . . .

6